**Sue Ann WILLIAMS, Plaintiff,**

v.

**CONTINENTAL CASUALTY COMPANY, also known as CNA, Defendant.**

No. 3:99–0322.

United States District Court, M.D. Tennessee, Nashville Division.

April 24, 2001.

Larry Leonard Roberts, Gena B. Lewis, Roberts & Associates, Nashville, TN, for Sue Ann Williams.

Steven Douglas Parman, Watkins, McGugin, McNeilly & Rowan, Nashville, TN, for Continental Casualty Company.

## MEMORANDUM

TRAUGER, District Judge.

Pending before the court is the plaintiff's appeal of the plan administrator's denial of short-term disability benefits under a disability plan governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* The defendant has filed a memorandum in support of the administrator's decision (Docket No. 12), the plaintiff has filed a memorandum in support of reversing the administrator's decision (Docket No. 22), and the defendant has filed a reply. (Docket No. 23) For the reasons discussed

herein, the court will enter JUDGMENT in favor of the plaintiff and REVERSE the determination of the plan administrator denying the plaintiff's application for short-term disability benefits.

## I. PROCEDURAL HISTORY

On or about May 12, 1985, the plaintiff began working for Union Planters Corporation ("Union Planters") as a proof operator. (Docket No. 16, para. 3)[1] Thereafter, Union Planters established a short-term disability plan for its eligible employees that became effective on January 1, 1996. (Docket No. 10, Administrative Record ("AR") at 016) This plan was issued by the defendant, Continental Casualty Company, also known as CNA ("CNA"). (Docket No. 16, paras. 4, 6)

On or about July 28, 1998, the plaintiff submitted a claim for benefits under the policy. (Docket No. 10, AR at 032) On September 29, 1998, CNA informed the plaintiff by letter that her claim for benefits was denied. Id., AR at 063–64. On October 15, 1998, the plaintiff sent a letter to CNA stating that she would be appealing the denial of benefits. Id., AR at 066. On November 30, 1998, the Appeals Committee sent a letter to the plaintiff informing her that the initial determination was found to be correct and proper and that her claim for benefits was denied. Id., AR at 069–71.

On March 19, 1999, the plaintiff filed a claim in Davidson County Chancery Court alleging various state law claims relating to the denial of benefits. (Docket No. 1, attach. Ex. 2) The defendant removed the case to federal court on April 14, 1999, on grounds that the plaintiff's claims arise under ERISA, 29 U.S.C. § 1132 (2000). (Docket No. 2, para. 2) Pursuant to the case management plan and the agreement of the parties,[2] the parties submitted briefs so that the court could render judgment regarding the denial of benefits under the short-term disability plan.

---

1. The plaintiff moved the court to allow the submission of an amended complaint on September 13, 1999. (Docket No. 11) Pursuant to the case management plan, the defendant filed its brief in support of the administrator's decision on October 4, 1999. (Docket No. 12) The plaintiff's motion to amend the complaint was granted by the court on October 5, 1999, and the plaintiff was given ten days to file an amended complaint. (Docket No. 13)

The plaintiff filed an amended complaint thereafter and simultaneously submitted a motion for leave to file a second amended complaint. (Docket No. 16; Docket No. 14) The court granted the plaintiff's motion to file a second amended complaint on October 19, 1999. (Docket No. 15)

The defendant then filed a motion to strike the first amended complaint and / or to strike "any new factual allegations and / or new theories of recovery not set forth in the original motion to amend" that was granted by the court on October 5, 1999. (Docket No. 18) The defendant also filed a motion to set aside the court's order granting the plaintiff's motion to submit a second amended complaint. (Docket No. 17)

From the defendant's arguments, it is clear that the defendant does not object to the amended complaint insofar as it states a claim under 29 U.S.C. § 1132 for benefits under a short-term disability plan. Because the defendant briefed only the issue of the denial of benefits under the short-term disability plan in its brief in support of the administrator's decision (Docket No. 12), the court found that the appropriate resolution of this situation was to limit the court's review to the issue of the denial of benefits under the short-term disability plan and to reserve ruling on the outstanding motions regarding the complaint pending resolution of the short-term disability benefits claim. In a telephone conference, the parties agreed to this approach. Thus, the amended complaint (Docket No. 16) will be relied on by the court only insofar as it states a claim regarding the denial of benefits under the short-term disability plan.

2. See id.

## II. ANALYSIS

Pursuant to the Sixth Circuit's holding in *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 619 (6th Cir.1998), the court reviews a denial of benefits under an ERISA plan and renders judgment based upon the administrative record. *See id.; Gatlin v. National Healthcare Corp.,* 2001 WL 223732, at *2 (6th Cir.2001) (unpublished); *In re Campbell,* 116 F.Supp.2d 937, 940–41 (M.D.Tenn.2000); *Marchetti v. Sun Life Assurance Co. of Canada,* 30 F .Supp.2d 1001, 1004 (M.D.Tenn.1998). Thus, the court will confine its review to the administrative record and will render findings of fact and conclusions of law accordingly. *See Wilkins,* 150 F.3d at 619; *see also Perry v. Simplicity Engineering,* 900 F.2d 963, 966 (holding that the district court is limited to considering the administrative record in reviewing the denial of benefits under an ERISA plan).

### A. FINDINGS OF FACT

Union Planters established a short-term disability policy through CNA effective January 1, 1996. (Docket No. 10, AR at 014)[3] The plaintiff began working for Union Planters in 1985 and was employed as a proof operator at the time of her alleged disability. *Id.,* AR at 032. As an active employee at Union Planters, the plaintiff was enrolled in this policy as of January 1, 1996, and remained enrolled at the time she sought benefits under this policy in July 1998. *Id.,* AR at 044, 050, 052.

Under the short-term disability benefit policy, CNA "will pay the Short Term Disability Benefit for each week of Total Disability which continues after the Elimination Period. The Short Term Disability Benefit will not be payable during the Elimination Period nor beyond the Maximum Period Payable." *Id.,* AR at 017. The Elimination Period is defined as "the number of days at the beginning of a continuous period of Disability for which no benefits are payable." *Id.,* AR at 016. The Elimination Period under Union Planters' policy is thirty (30) days. *Id.,* AR at 031. The Maximum Period Payable under Union Planters' policy is twenty-two (22) weeks. *Id.* Thus, an employee is entitled to receive short-term disability benefits after he or she has suffered a continuing total disability for a period of thirty (30) days and may receive those benefits for up to twenty-two (22) weeks from that point, as long as the total disability continues.

Under the policy, "total disability" is defined as follows:

"Total Disability" means that the Insured Employee, because of Injury or Sickness, is:

(1) continuously unable to perform the substantial and material duties of the Insured Employee's regular occupation;

(2) under the regular care of a licensed physician other than the Insured Employee; and

(3) not gainfully employed in any occupation for which the Insured Employee

---

**3.** The Administrative Record contains plan documents relating to the Union Planters long-term disability policy (policy number SR–83986476), and the policy relating to the Union Planters short-term disability policy (policy number SR–83094175). (Docket No. 10, AR at 011; *id.,* AR at 014) Although the plaintiff notes that the plan documents and policy are for different insurance plans, neither party questions the court's ability to ren-

der judgment on the basis of the Administrative Record as presented. Since the short-term disability policy contains all the plan information relevant to the resolution of the plaintiff's claim for short-term disability benefits, the court will rely on that policy (Docket No. 10, AR at 014–31) and not on the plan documents relating to the long-term disability policy (Docket No. 10, AR at 01–13).

is or becomes qualified by education, training or experience.

*Id.,* AR at 017. "Injury" is defined as "bodily injury caused by an accident which results in a loss, directly and independently of all other causes." *Id.,* AR at 016. "Sickness" is defined as "sickness or disease causing loss which begins while the Insured Employee's coverage is in force." *Id.,* AR at 017.

The following provisions of the policy relate to the filing and payment of a claim for benefits:

NOTICE OF CLAIM. Written notice of claim must be given to [CNA] within 30 days after the loss begins or as soon as reasonably possible. The notice will suffice if it identifies the Insured Employee and this policy . . . .

CLAIM FORMS. After [CNA] receive[s] the written notice of claim, [CNA] will furnish claim forms within 15 days. If [CNA does] not, the claimant will be considered to have met the requirements for written proof of loss if [CNA] receive[s] written proof which describes the occurrence, extent and nature of the loss.

WRITTEN PROOF OF LOSS. Written proof of loss must be furnished to [CNA] within 90 days after the end of a period for which [CNA is] liable. If it is not possible to give the proof within 90 days, the claim is not affected if the proof is given as soon as reasonably possible. Unless the Insured Employee is legally incapacitated, written proof must be given within 1 year of the time it is otherwise due.

TIME OF PAYMENT OF CLAIM. Benefits will be paid weekly, biweekly, or monthly, whichever applies, immediately after [CNA] receive[s] due written proof of loss.

*Id.,* AR at 021. In addition, CNA has "the right to have a physician examine the In-

sured Employee as often as reasonably necessary while the claim is pending," at the expense of CNA. *Id.*

On or about July 31, 1998, the plaintiff filed a claim for benefits under this policy for a total disability based on osteoarthritis in her right knee. *Id.,* AR at 032. She completed a CNA claim form and had her employer, Union Planters, and her physician, Dr. Stewart Stowers, complete their respective portions of the form. *Id.* In the employer's section, Ken Anderson, Executive Vice President of Union Planters, stated that, as a proof operator, the plaintiff "prepares check trays for courier pickup [and] accepts deliveries" and that the plaintiff's job required the lifting or carrying of trays weighing thirty (30) pounds. *Id.*

In the treating physician section, Dr. Stowers stated that the plaintiff was first treated for osteoarthritis of the right knee on May 3, 1994, and that she suffered a total disability based on this condition as of July 31, 1998. *Id.* Dr. Stowers stated that the plaintiff would "possibly never" return to work and that she could not resume full duties upon returning to work but must abide by certain restrictions. *Id.* With regard to those restrictions, Dr. Stowers included the following statement on the reverse side of the claim form:

I think at this point she needs to apply for disability because I don't think she can continue this type of job. She needs a job that is primarily a sit down job only but does allow her occasionally to stand and stretch her legs. No climbing, squatting, stooping, extended walking or standing and no extended drives in a car. She is going to apply for disability and I support her application.

/s/ Stewart Stowers

*Id.,* AR at 033.

CNA sent a letter to the plaintiff on August 13, 1998, acknowledging receipt of

the claim for benefits. *Id.*, AR at 057. The letter informed the plaintiff that she would not be eligible to receive benefits until August 20, 1998, based on the thirty-day Elimination Period. *Id.* The letter also stated that she needed to be "under the regular care of a licensed physician" in order to qualify for benefits. *Id.* The letter then stated:

At this time, additional medical information is being obtained from Dr. Stowers concerning the details of your present disability status, exact limitations, treatment plan, prognosis, etc . . . .

We will proceed with the processing of your claim upon receipt and review of the information requested.

*Id.*

On August 17, 1998, Keith Lear, the claims adjuster assigned to the plaintiff's claim, interviewed the plaintiff regarding her request for benefits. The plaintiff verified her condition and stated that it was progressive and had become worse over the previous six months. *Id.*, AR at 037. The plaintiff also stated that "she can't hardly walk at all" and that "it hurts even when she lays down." *Id.* With regard to her medical treatment, Lear recorded that the plaintiff was being treated by Dr. Stowers, the plaintiff had received injections for the osteoarthritis but could not receive another injection until September, and the plaintiff had been given a prescription for daypro and tylenol for the pain. *Id.* Under "Activities," Lear recorded that the plaintiff's husband did most of the cooking and cleaning, and the plaintiff would shop where there was a wheelchair available for her use. *Id.* The plaintiff also verified her job requirements, essentially reflecting what had been stated by Union Planters, although the plaintiff claimed that the trays she carried weighed sixty (60) pounds. *Id.*

On August 18, 1998, Union Planters' Assistant Vice President Larry Robinson completed and submitted to CNA an "Employer's Job Activities Statement" regarding the plaintiff's position as a proof operator. *Id.*, AR at 039–40. According to Robinson, the plaintiff's job activities were to "[p]rocess checks through a proof encoder, assemble and carry trays of 2500 checks to courier pickup" and to "[p]rocess return mail and food coupons." *Id.*, AR at 039. According to Robinson, the trays weighed between five (5) and ten (10) pounds. *Id.* The plaintiff's job could not be modified either temporarily or permanently and required five (5) hours of sitting, one (1) hour of standing, and two (2) hours of walking daily. *Id.* In addition, the plaintiff was required to lift and carry trays of checks and coupons weighing five to ten (5–10) pounds approximately eight (8) times per day, for a total of approximately one (1) hour per day. *Id.*

On August 27, 1998, Jerilyn Vasilaros, a nurse case manager at CNA, sent a letter to Dr. Stowers stating that "[d]isability as defined by the carrier is the insured's inability to perform the essential functions of their occupation due to an impairment caused by a specific medical condition. It is essential to document objective findings to substantiate disability." *Id.*, AR at 058. Vasilaros requested that Dr. Stowers "send a copy of all progress notes, office visits, consults, written reports, tests or procedures from 1–1–98 to present." *Id.* CNA did not request any earlier medical records relating to the diagnosis or treatment of the plaintiff's condition, either in this letter or at any later time.

On the same date, Vasilaros sent a second letter to Dr. Stowers requesting that he fill out and return an attached Physical Capacities Evaluation on the plaintiff. *Id.*, AR at 059. This evaluation consisted of a checklist of various physical activities and

asked the physician to rate how often the employee could perform those activities. *Id.*, AR at 061. The evaluation included (1) how often the employee could sit, stand, and walk at any one time during a workday; (2) the total amount of time the employee could sit, stand, and walk during a workday; (3) whether the employee could lift, push, and carry weights ranging from "up to 5 pounds" to "51 to 100 pounds"; (4) whether the employee could use each hand for simple grasping, pushing and pulling arm controls, and fine manipulation; (5) whether the employee could use either or both feet for repetitive movements such as pushing foot controls; (6) how well the employee could bend, squat, crawl, climb, and reach; and (7) what level of restriction, if any, the employee had on activities involving unprotected heights, moving machinery, exposure to marked changes in temperature and humidity, driving automotive equipment, and exposure to dust, fumes, and gas. *Id.* Finally, the evaluation form requested the doctor to indicate when the employee could return to work, within the noted restrictions, and allowed the doctor to offer any other comments regarding the employee's functional limitations. *Id.*

In response to Vasilaros' first letter, Dr. Stowers sent his notes from the plaintiff's office visits on June 30, 1998, and July 21, 1998. For June 30, Dr. Stowers noted that the plaintiff had "progressive right knee recurrent problems." *Id.*, AR at 075. He stated that it was "impossible to tell whether she has an effusion today, but does have a fair amount of pain to palpation along the medial retinaculum." *Id.* Dr. Stowers then discussed options with the plaintiff and "reinjected the 9 cc's of Marcaine and 1 cc of Celestone." *Id.* Dr. Stowers stated that he would see her "as needed." *Id.* For July 21, Dr. Stowers stated that the plaintiff's "knee [was] giv-

ing her trouble again." *Id.*, AR at 076. He then stated:

> The injections help her for a little while but soon they wear off. Her job requires walking, intermittent standing and some driving.
>
> I think at this point she needs to apply for disability because I don't think she can continue this type of job. She needs a job that is primarily a sit down job only but does allow her occasionally to stand and stretch her legs. No climbing, squatting, stooping, extended walking or standing and no extended drives in a car. She is going to apply for disability and I support her application.

*Id.* There is no indication in the record that Dr. Stowers completed or returned the Physical Capacities Evaluation form.

On September 16, 1998, Vasilaros sent a follow-up letter to Dr. Stowers acknowledging receipt of the "progress note" from July 21, 1998 that listed "restrictions" for the plaintiff. *Id.*, AR at 060. Vasilaros then stated that she was "again sending [Dr. Stowers] a copy [of] the Job Activities Statement which lists [the plaintiff's] duties." *Id.* Vasilaros requested that Dr. Stowers answer two questions: (1) "Based on the Job Description what duties can your patient not perform?" and (2) "Do you feel that your patient will ever sufficiently improve enough to perform the job outlined in the job description?" *Id.* Dr. Stowers' hand-written response to the first question was: "She needs a sit down job, but needs to be able to occasionally stand and stretch her legs. No climbing, squatting, stooping, extended walking or standing and no extended drives in a car. She is to apply for disability and I support that." *Id.*, AR at 079. In response to the second question, Dr. Stowers simply said, "No." *Id.*

On September 29, 1998, CNA informed the plaintiff of its determination regarding

her claim for benefits. In relevant part, the letter stated:

On 7/30/98, we received your claim for Short Term Disability benefits with a diagnosis of osteoarthritis of the right knee. On the claim form, Dr. Stowers included your restrictions and limitations . . . . However, no objective medical information was submitted to support these restrictions and limitations. Therefore, in order to effectively evaluate your claim, we requested your medical records from Dr. Stowers.[4] We received office notes from 6/30/98 and 7/21/98 . . . .

Your employer completed a job activities statement which reports that your job requires that you sit 5 hours per day, stand 1 hour per day, and walk 2 hours per day. Driving was not reported as a duty of your position. These requirements of your job are not outside the limitations provided by your physician . . . .

Objective evidence means signs and findings established by medically acceptable diagnostic techniques which show the existence of a medical impairment that results from an anatomical, physiological, or psychological abnormality which could reasonably be expected to produce the pain or other symptoms alleged. Subjective complaints alone shall not be considered conclusive evidence of disability.

The objective medical information does not document your inability to perform the substantial and material duties of your position as Proof Operator, which is a sedentary job. Therefore, we are unable to honor your claim for Short Term Disability benefits.

*Id.,* AR at 063–64. CNA informed the plaintiff that, if she had "additional medical information not mentioned above or wish[ed] [CNA] to reconsider" the decision, she should inform CNA within sixty (60) days. *Id.,* AR at 064. If the decision was not reversed upon reconsideration, then the claim would be directed to the Appeals Committee for a formal review. *Id.*

On October 15, 1998, the plaintiff sent a letter to Keith Lear at CNA stating that she would be appealing the denial of benefits. *Id* ., AR at 066. On October 20, 1998, CNA sent a letter acknowledging receipt of the plaintiff's letter and stating that the initial determination would not be reconsidered because "no additional medical information" had been provided. *Id.,* AR at 068. Thus, the plaintiff's claim was forwarded to the Appeals Committee for formal review. *Id.*

On October 29, 1998, the plaintiff, through her attorney, sent a letter to Lear enclosing additional information for review by the Appeals Committee. *Id.,* AR at 072. The letter apparently included both Dr. Stowers' notes from October 6, 1998, when he again met with the plaintiff regarding her condition, and a copy of a report from Michael Levitt, M.D., discussing the results of a radiological examination (presumably an x-ray) of the plaintiff's right knee conducted on September 28, 1998. *Id.,* AR at 072, 080–81. Dr. Stowers' notes indicate the doctor's finding that

---

**4.** Both this letter and the earlier letter from CNA acknowledging receipt of the plaintiff's claim form, (Docket No. 10, AR at 057), indicate that CNA took responsibility for obtaining medical records from Dr. Stowers relating to the plaintiff's osteoarthritis. As discussed *infra,* CNA never informed the plaintiff that

only limited medical records were requested from Dr. Stowers. Thus, it is reasonable for the plaintiff to have assumed that CNA had all relevant medical records, including any objective medical evidence obtained by Dr. Stowers when the osteoarthritis was diagnosed in 1994.

the plaintiff "has been unable to participate in her job." Dr. Stowers stated:

> [Union Planters and CNA] outline her job as requiring one hour per day of standing, two hours per day of walking. She is not able to do this by any stretch. I would say that she could walk for a maximum of 30 minutes per day and this should be broken up into small segments and that I wouldn't want her standing for more than 30 minutes per day also. Clearly she is unable to participate in her present job . . . .
>
> One of the criteria for them refusing disability benefits is that I have no objective evidence of her problem other than subjective pain. This is just not true. She has end stage osteoarthritis of the patellofemoral joint. This is well documented on x-rays and mentioned throughout my notes.[5]

*Id.*, AR at 081. Similarly Dr. Levitt's opinion of the plaintiff's medical condition was that she has "severe tricompartmental osteoarthritis" based on the following findings:

> There is severe narrowing of the medial and lateral joint compartments. There is narrowing of the patellofemoral articulation with subchondral sclerosis of the patella. There is spurring at the superior and inferior margins of the patella. An approximately 1 cm × 0.5 cm osteophytic density superior to the patella may represent a loose body or portion of an osteophytic spur. There is no fracture.

*Id.*, AR at 080.

On November 30, 1998, the Appeals Committee upheld the decision to deny benefits to the plaintiff. *Id.*, AR at 069–71. The Appeals Committee stated that, in reaching this decision, they had "carefully reviewed medical records from Dr. Stewart Stowers," but there was not sufficient objective medical evidence to support a finding of total disability. *Id.*, AR at 069–70. According to the Committee,

> Medical documentation is used to determine the severity and functionality as well as validate and substantiate the claim. Our determination is based on the information documented in the medical records, his/her observations and treatment of the claimant and how it relates to the functional capabilities of the claimant to perform the material and substantial duties of the occupation.

*Id.*, AR at 069. The Committee reviewed Dr. Stowers' notes from the plaintiff's office visits but found that no physical examinations were documented. *Id.*, AR at 069–70. Based on their review, the Committee stated:

> After careful review of your file, we fail to find objective medical evidence that is necessary to support that you are physically not capable of performing the essential duties of your occupation as a Proof Operator. While we respect your physician's opinion, under ERISA we have the right to determine your eligibility for benefits. Dr. Stowers' medical records emphasized his opinion that you were unable to perform the activities of your occupation, however he failed to submit any objective medical evidence to support this inability that he claims. No evidence of a physical examination was provided and no evidence of a functional capacity evaluation was submitted that would assist in documenting your capabilities. An x-ray of 9/28/98 supported the diagnosis of osteoarthritis; however, you have indicated that you have had this condition for some time and continued your occupation on a full time basis.

---

**5.** Dr. Stowers apparently believed that CNA had all of his notes and records, not just the notes from the plaintiff's previous two office visits.

You state the condition had worsened over the past few months; however, we do not have any objective proof of this finding. There have been no comparisons of any x-rays or MRI's of your knee submitted for review. Even so, you would be limited to restrictions of the right knee or right lower extremity only. Therefore, we fail to find objective medical evidence that is necessary to support that you are not capable of performing the essential duties of your occupation as a Proof Operator . . . .

According to the job activity statement provided by your company, you are within your restrictions given by your physician . . . .

It is noted that your physician, as of 10/6/98 now indicates that you should not be standing or walking at all but for a maximum of 30 minutes a day broken up into small segments. Again, this is his opinion and he provides no medical evidence of this restriction. We do understand that you may have a condition and we have requested the medical documentation to support the severity of your condition. We have not received this information to date.

*Id.*, AR at 070. Based on these findings, the Appeals Committee affirmed the denial of benefits as "correct and proper." *Id.*, AR at 071.

### B. CONCLUSIONS OF LAW

#### 1. Standard of Review

■ Under the Supreme Court's holding in *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.*, at 115, 109

S.Ct. at 956–57. If such discretion does exist in the plan, then the administrator's decision must be reviewed under the more deferential "arbitrary and capricious" standard. *See Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir.1998) (en banc).

As the Sixth Circuit has noted, " '[t]he Court in *Firestone* . . . did not suggest that "discretionary authority" hinges on incantation of the word "discretion" or any other "magic word." ' " *Johnson v. Eaton Corp.*, 970 F.2d 1569, 1572 n. 2 (6th Cir. 1992) (quoting *Block v. Pitney Bowes, Inc.*, 952 F.2d 1450, 1453 (D.C.Cir.1992)). Yet, "[w]hile 'magic words' are unnecessary to vest discretion in the plan administrator and trigger the arbitrary and capricious standard of review, this circuit has consistently required that a plan contain 'a *clear* grant of discretion [to the administrator] to determine benefits or interpret the plan.' " *Perez*, 150 F.3d at 555 (en banc) (quoting *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1373 (6th Cir.1994)) (emphasis in original); *see also Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir.1996) (finding that the Sixth Circuit requires "that the plan's grant of discretionary authority to the administrator be 'express' ") (citations omitted).

CNA contends that the court must review the administrator's decision under the arbitrary and capricious standard because the plan clearly grants discretion to the administrator to determine benefits under the plan. (Docket No. 12 at 1–4) The plaintiff concedes that this is the appropriate standard. Upon review of the controlling case law and the language of the plan, the court finds that this view is incorrect and that, in fact, a *de novo* standard is proper in this case.

CNA argues that the use of the phrases "written proof of loss" and "due written proof of loss" in the policy establish that

the administrator has discretion in determining whether a claimant is eligible to receive benefits under the plan. (Docket No. 12 at 3–4) This language comes from the following provisions:

WRITTEN PROOF OF LOSS. *Written proof of loss* must be furnished to [CNA] within 90 days after the end of a period for which [CNA is] liable. If it is not possible to give the proof within 90 days, the claim is not affected if the proof is given as soon as reasonably possible. Unless the Insured Employee is legally incapacitated, written proof must be given within 1 year of the time it is otherwise due.

TIME OF PAYMENT OF CLAIM. Benefits will be paid weekly, biweekly, or monthly, whichever applies, immediately after [CNA] receive[s] *due written proof of loss.*

(Docket No. 10, AR at 021) (emphasis added).

In this circuit, a variety of plan language has been held to grant discretion to the plan administrator. *See Williams v. International Paper Co.,* 227 F.3d 706, 711 (6th Cir.2000) (finding that "the Plan clearly gives the Plan Administrator authority to determine eligibility for disability benefits inasmuch as the Plan Administrator must 'find that the Disability is likely to be permanent during the remainder of the Participant's life' "); *University Hospitals of Cleveland v. Emerson Elec. Co.,* 202 F.3d 839, 846 (6th Cir.2000) (finding an express grant of discretion because the "Plan in this case provides that the EBC 'shall have the discretionary authority to determine eligibility for benefits or to construe the terms of the Plan' "); *Administrative Committee of the Sea Ray Emp. Stock Ownership and Profit Sharing Plan v. Robinson,* 164 F.3d 981, 986 (6th Cir. 1999) (relying on plan language enabling the administrator to "construe" and to "in-

terpret" the plan as well as on a grant of discretion under "any of the provisions of the Plan" to find that the arbitrary and capricious standard is appropriate); *Perez,* 150 F.3d at 555–56 (en banc) (finding discretion where the plan states that the insurer "shall have the right to require as part of the proof of claim satisfactory evidence . . . that [the claimant] has furnished all required proofs for such benefits"); *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 381 (6th Cir.1996) (finding discretion where the plan requires "satisfactory proof of total disability"); *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 983 (6th Cir.1991) (finding discretion where the plan determines whether a claimant is disabled "on the basis of medical evidence satisfactory to the Insurance Company").

In arguing that "written proof" and "due written proof" are sufficient to grant discretion in this case, the defendant relies primarily on two opinions that do not have controlling authority in this court, *Patterson v. Caterpillar, Inc.,* 70 F.3d 503 (7th Cir.1995), and *Bollenbacher v. Helena Chem. Co.,* 926 F.Supp. 781 (N.D.Ind. 1996). (Docket No. 12 at 2–3) Both of these cases were cited with approval in *Perez. See Perez,* 150 F.3d at 556 (en banc). In *Patterson,* the Seventh Circuit held that the plan administrator had discretion under the plan where the plan stated that " 'benefits will be payable only upon receipt by the Insurance Carrier or Company of such notice and such due proof, as shall be from time to time required, of such disability.' " *Patterson,* 70 F.3d at 505. In *Bollenbacher,* the district court found that there was a grant of discretion where the plan required " 'proof that the individual is disabled due to sickness or injury and requires the regular attendance of a physician.' " *Bollenbach-*

*er*, 926 F.Supp. at 786. The court reasoned,

> A plan administrator that requests 'proof' of a claimant's disability must out of necessity examine the evidence submitted by the claimant to determine whether or not it amounts to 'proof' of the alleged disability. Obviously, if the proof is sufficient, the administrator will (or at least should) determine that the claimant is eligible for benefits; if the proof is not sufficient, eligibility will be denied. In short, plan language which requires a claimant to submit 'proof' of a claim does, by its very nature, grant discretion to the plan administrator to determine eligibility for benefits .... A plan that requires 'proof,' as does the plan in this case, implicitly grants to the administrator the discretion to determine eligibility under the plan based on the administrator's assessment of that proof.

*Id.* at 787. In making this determination, the court rejected the plaintiff's argument that "a plan must contain some kind of qualifying language pertaining to the *degree* of proof required, or the extent to which a plan administrator is empowered to weigh the proof submitted." *Id.* (emphasis in original).

Two recent, unpublished opinions from the Sixth Circuit indicate that this circuit requires more than an implicit grant of discretion or a requirement of "proof," even though the defendant's cases were cited with approval in *Perez*. In *Sparks v. Unum Life Ins. Co. of America*, 225 F.3d 659, 2000 WL 1033003 (6th Cir.) (table), the court considered the same language as in *Bollenbacher* and found that a requirement of "proof" was not, in itself, sufficient to grant discretion to the plan administrator. *See id.*, 225 F.3d 659, 2000 WL 1033003, at *3. The court held that "unless a plan requires a showing of 'satisfactory proof,' or some other qualitative threshold of proof, our precedents provide that the plan does not provide the administrator with discretion .... In the absence of such qualitative or subjective language, the plan does not confer discretion under *Firestone* ...." *Id.* (internal citations omitted).

In *Chiera v. John Hancock Mutual Life Ins. Co.*, 2001 WL 111585 (6th Cir.) (table), the Sixth Circuit considered plan language requiring "written proof of loss." *See* 2001 WL 111585, at *5. The court found that

> [a]lthough Defendant must be provided with written proof of loss, the policy does not expressly bestow upon Defendant any authority to determine whether such proof of loss is sufficient. Unlike *Perez* and *Yeager*, there is no requirement under the AD & D policy that the proof of loss had to be 'satisfactory' to Defendant. Moreover, *Firestone* and this Court's interpretation of *Firestone* mandate that the plan explicitly grant discretionary authority before an arbitrary and capricious standard of review can be applied. That Defendant must be provided with 'written proof of loss' does not explicitly grant it discretionary authority. Because Defendant was not expressly vested with discretionary authority under the AD & D policy, this Court concludes that the district court properly applied *de novo* review rather than the arbitrary and capricious standard.

*Id.* (internal citation omitted).

In this case, CNA relies solely on the requirement of "written proof of loss" and on the statement that claims will be paid "immediately after [CNA] receive[s] due written proof of loss" as vesting discretion in the plan administrator to determine whether a claimant is eligible for benefits. An ERISA plan is interpreted in the same manner as a contract; thus, the plain language of the policy controls. *See*

*Williams,* 227 F.3d at 711; *Administrative Committee,* 164 F.3d at 986. The policy states that an insured must file written notice of a claim within thirty days of the loss. (Docket No. 10, AR at 021) Within fifteen days of receipt of this notice, CNA will provide the insured with a claim form. *Id.* If CNA fails to provide the claim form, the policy states that "the claimant will be considered to have met the requirements for written proof of loss if [CNA] receive[s] written proof which describes the occurrence, extent and nature of the loss." *Id.* Thus, the policy indicates that the requirement of written proof of loss may be met either through completion of the claim form or, if the claim form is not sent by CNA, by sending a document describing the occurrence, nature and extent of the loss. This provision does not indicate any qualitative standard that the claimant must meet under either form of proof.

The only arguably qualitative term found in regard to the proof is in the provision relating to the payment of claims, where the policy states that payments will be made once CNA receives "due written proof of loss." However, there is nothing to indicate that this phrase is intended to create a qualitative standard of proof. In addition, the phrase "due written proof" appears only in the provision relating to the time of the payment of claims and not in the provisions relating to the proof requirements, where

an insured would expect to find any prerequisites for receiving benefits. A plain reading of this provision indicates that the phrase "due written proof" refers to the fact that there are two ways to fulfill the requirement of written proof, and that benefits will be paid when either form of written proof is received. There is nothing in the policy to support a reading that the singular use of this phrase in this provision vests discretion in the plan administrator to determine the sufficiency of the proof submitted by the claimant seeking benefits.

In light of the Sixth Circuit's opinions in *Chiera* and *Sparks,* and based on a plain reading of the plan document at issue,[6] the court finds that there is no language in the plan document granting discretion to the plan administrator to determine eligibility for benefits or to construe the terms of the plan. Thus, the court must review the administrator's denial of benefits *de novo.*

*2. Review of Administrator's Decision*

■ As an initial matter, the court must determine what evidence the claimant is required to submit to show that she is entitled to benefits under the policy. The policy states that benefits will be paid for "total disability." (Docket No. 10, AR at 017) In order to be defined as totally disabled, a claimant must be "(1) continuously unable to perform the substantial and material duties of the Insured Employee's

---

6. As discussed *supra,* the only plan document in the Administrative Record relating to the short-term disability plan is the policy itself, and it is upon the policy language that the defendant relies for its argument concerning the standard of review. *See supra,* note 3.

The long-term disability plan, which is included in the Administrative Record, contains language identical to the short-term disability policy relating to the filing of claims and the payment of benefits. Without relying on the language in the long-term disability plan in ruling on this case, the court notes that the

long-term disability plan does not contain any other language, outside that already considered, that would support a grant of discretion to the plan administrator. In addition, the plan states that "[n]ormally, [the claimant's] own physician determines the degree of physical impairment caused by the disabling condition." (Docket No. 10, AR at 004) This language would support the conclusion that the long-term disability plan does not grant discretion to the plan administrator to determine benefits or to construe the terms of the plan.

regular occupation; (2) under the regular care of a licensed physician other than the Insured Employee; and (3) not gainfully employed in any occupation for which the Insured Employee is or becomes qualified by education, training or experience." *Id.,* AR at 017. As discussed previously, the policy states that the claimant must submit the completed claim form or provide evidence describing the occurrence, nature, and extent of the loss. There are no other requirements in the policy.

In its letters of denial of benefits, CNA imposed an additional requirement that the plaintiff had to submit "objective medical information" or "objective evidence" of the disability in order to be entitled to benefits. (Docket No. 10, AR at 064, 070) This requirement is not found in the policy, and there is no indication that the plaintiff had any knowledge of this alleged requirement prior to receiving the letter informing her that her request for benefits was denied. As stated previously, an ERISA policy is interpreted as a contract between the insured and the insurer. *See Williams,* 227 F.3d at 711; *Administrative Committee,* 164 F.3d at 986. The court will not impose conditions of performance on a party that are not established in the language of the policy. There are no qualitative standards of proof under the clear and plain terms of the policy. Thus, the court will determine whether the plaintiff has met the requirements of the policy, but the court will not impose CNA's heightened "objective evidence" requirement.

Dr. Stewart Stowers, the plaintiff's treating physician, practices with the Tennessee Orthopaedic Alliance. (Docket No. 10, AR at 075) According to the Attending Physician portion of the plaintiff's claim form, Dr. Stowers began treating the plaintiff for osteoarthritis of the right knee in May 1994. The condition became total-

ly disabling as of July 31, 1998. In his office notes from June 1998, Dr. Stowers described the plaintiff's condition as "progressive." In office notes from October 1998, Dr. Stowers stated that the plaintiff's condition was "well documented on x-rays and mentioned throughout [his] notes." *Id.,* AR at 081. At some point prior to June 1998, Dr. Stowers prescribed injections to alleviate the pain but indicated in July 1998 that the injections were only providing temporary relief. According to the claim form, completed by Dr. Stowers on July 28, 1998, the plaintiff was restricted to "[n]o climbing, squatting, stooping, extended walking or standing and no extended drives in a car." (Docket No. 10, AR at 033) Dr. Stowers repeated these restrictions in response to a question from CNA after the plaintiff had applied for disability benefits. *Id.,* AR at 079.

According to the Employer's Job Activities Statement completed by Union Planters, the plaintiff's position as a proof operator requires one (1) hour of standing and two (2) hours of walking per day, one (1) hour of which included carrying trays of checks and food coupons weighing five to ten pounds. Union Planters stated that these job requirements could not be modified either temporarily or permanently.

In office notes from October 1998, Dr. Stowers specifically addressed the requirements listed by Union Planters. Dr. Stowers stated that the plaintiff was not able to meet the above requirements "by any stretch." *Id.,* AR at 081. Dr. Stowers stated that the plaintiff "could walk for a maximum of 30 minutes per day and this should be broken up into small segments and [he] wouldn't want her standing for more than 30 minutes per day also." *Id.*

Dr. Stowers' findings regarding the plaintiff's medical condition were substantiated by Dr. Levitt, who performed an x-ray of the plaintiff's right knee in Septem-

ber 1998. In his report, Dr. Levitt found that the plaintiff suffered from "severe tricompartmental osteoarthritis." (Docket No. 10, AR at 080)

Based on this evidence, the court finds that the plaintiff has submitted proof that she is "continuously unable to perform the substantial and material duties of [her] regular occupation." Thus, the plaintiff has met the first element of showing she suffers from a total disability. The plaintiff's occupation would require her to stand for twice the amount of time and walk for four times the amount of time allowed by her medical condition, not to mention requiring her to carry trays weighing 5–10 pounds eight times per day. Union Planters considers these activities to be substantial and material job requirements that could not be modified to accommodate the plaintiff's medical needs.

CNA makes two arguments against this finding. First, CNA argues that the plaintiff's occupation consists of more than her job as a proof operator at Union Planters. CNA argues that "the most reasonable interpretation of ["regular occupation"] is that benefits would be available only if the claimant could not work at any job appropriate for her level of education and experience." (Docket No. 12 at 10) Because

the evidence relates only to the plaintiff's ability to perform her current "job," the plaintiff cannot be found to have established the first element of a total disability.

The definition of "total disability" refutes the defendant's argument. The first prong considers whether the plaintiff is able to perform the essential duties of her regular occupation. The third prong considers whether the plaintiff is "gainfully employed in any occupation for which [she] is or becomes qualified by education, training or experience." (Docket No. 10, AR at 017) If proving the first element were to require a showing that the plaintiff is unable to perform any other occupation for which she is qualified by education or experience, then there would be no reason to include the third element. Thus, the plaintiff's regular occupation is being a proof operator, as defined by Union Planters' Employer Job Activities Statement, and the plaintiff has fulfilled the requirements of the first element of "total disability" by showing that she was unable to perform the essential elements of that occupation.[7]

Second, CNA argues that the plaintiff has not provided competent medical evidence of her condition because she relies solely on her doctor's opinion.[8] CNA bas-

---

7. CNA also argues that the plaintiff's occupation is "clerical" worker rather than proof operator. CNA bases this argument on a prior request for disability benefits where the employer listed the plaintiff's employment activities as "clerical." (Docket No. 10, AR at 035; Docket No. 12 at 10–12) It is unclear why Union Planters completed the earlier form in this manner, but it may be related to the fact that the earlier claim involved hospitalization and a recovery period that made it impossible for the plaintiff to work at all. In the present claim, the plaintiff is unable to perform specific functions of her job while able to perform others. Thus, it was more important for the employer to enumerate the plaintiff's job tasks clearly in the present form. In this claim, Union Planters listed the

plaintiff's occupation as "proof operator" and indicated that walking, standing, and carrying trays weighing 5–10 pounds were essential job functions. That is the basis of the court's opinion.

8. Although the long-term disability policy is not before the court, the plan documents for the long-term disability plan were included in the Administrative Record. Most of the language is identical to that in the short-term disability policy. Under the caption, "What Constitutes Total Disability?" the plan includes the following statement:

To be considered disabled, you must be under a doctor's care. Normally, your own physician determines the degree of physical

es this argument on the fact that Dr. Stowers did not return the Physical Capacities Evaluation Form and on the lack of objective medical evidence to support Dr. Stowers' notes from the plaintiff's office visits. Having reviewed the Physical Capacities Evaluation Form and Dr. Stowers' comments, the court is satisfied that Dr. Stowers addressed the relevant inquiries from the form. The form requests evaluation of a number of physical functions, including grasping ability and ability to function at unprotected heights, that are not listed as essential functions of the plaintiff's occupation. (Docket No. 10, AR at 061) The doctor's comments do address many of the items listed on the form relevant to the plaintiff's ability to perform the essential functions of her job. The court is not persuaded that there is a distinction to be made in the fact that the doctor provided this information in narrative form rather than on the checklist provided by the defendant.

As to the objective nature of the medical proof, there is no qualitative standard presented in the policy for the type of medical proof required. The only requirement is that the plaintiff submit a completed claim form, which she did. Dr. Stowers completed the portions of the form identifying the occurrence, nature, and extent of the disability. In addition, although the claim form clearly states that the plaintiff had been treated for osteoarthritis since 1994, the defendant requested medical records from Dr. Stowers only from the period of January 1, 1998, forward. (Docket No. 10, AR at 058) CNA informed the plaintiff

that it was obtaining "additional medical information" from Dr. Stowers and did not request any further information from her regarding her disability.[9] Because the condition was diagnosed in 1994, it is reasonable that the office notes from 1998 do not reflect the objective medical evidence used for the diagnosis.

If the records from 1998 were not sufficient, the defendant could have requested additional records from Dr. Stowers or requested that the plaintiff submit to an independent physical examination, as provided for in the policy. Instead, the defendant relied upon the limited records it requested from Dr. Stowers and then found that those records were not sufficient to prove a total disability. Without any contradictory medical evidence, the defendant rejected Dr. Stowers' diagnosis and findings as "opinion" and "conclusory."

Although the court agrees that mere subjective complaints from the plaintiff would not be sufficient to establish a disability, in this case the plaintiff's doctor recorded the ongoing physical effects of the plaintiff's progressive condition. These findings were supported by the results of an x-ray interpreted by Dr. Levitt that indicated severe tricompartmental osteoarthritis. The court finds no basis in the record to dispute the medical findings and physical limitations dictated by the plaintiff's treating physician. Although additional medical information from the earlier stages of the plaintiff's condition may have further substantiated the plaintiff's claim, the record before the court

---

impairment caused by the disabling condition.
(Docket No. 10, AR at 004) Although this language is in the long-term disability plan and not in the short-term disability policy, it does indicate that CNA's own policy was to rely on the diagnosis and findings of the treating physician and that the plan administrator

did not have the authority to disregard those findings without contradictory medical evidence.

9. There is no evidence that the plaintiff was notified of the limited nature of CNA's inquiry into Dr. Stowers' records. (Docket No. 10, AR at 057, 063, 071)

contains medical proof that the plaintiff was suffering from osteoarthritis and that the limitations imposed by that condition prevented her from being able to perform the essential functions of her regular occupation.

Because the defendant denied benefits on the grounds that the plaintiff was capable of performing the essential functions of her regular occupation, the parties have limited their arguments on appeal to that issue. However, because the court has found that the plaintiff has satisfied the first element of "total disability," the court must review the record and determine whether there is evidence of the remaining elements. The court is satisfied that the second element has been satisfied because the plaintiff was under the regular care of a physician. The plaintiff had been seeing Dr. Stowers for her osteoarthritis since 1994 and continued to see him throughout 1998.

As for the third element of "total disability," that the plaintiff was not employed in another occupation for which she was qualified, there is limited information in the record. In her claim form, Union Planters stated that the plaintiff's last day of work was July 30, 1998. (Docket No. 10, AR at 032) CNA verified this date in several letters. *Id.,* AR at 057, 063, 069. Dr. Stowers stated that the plaintiff's date of return to work was "possibly never," and there is no evidence to indicate that the plaintiff accepted another position while her claim was pending with CNA. *Id.,* AR at 032. Thus, the court is satisfied that the plaintiff was "not gainfully employed in any occupation for which [she][was] or [became] qualified by education, training or experience" at the time she requested benefits from CNA.

The plaintiff submitted the required information to substantiate her claim for short-term disability benefits under her ERISA plan. The written proof submitted by the plaintiff and obtained by CNA from her employer and her doctor provided evidence that the plaintiff was totally disabled as of July 31, 1998. Under the terms of her ERISA plan, the plaintiff was entitled to receive benefits for twenty-two weeks after the completion of the thirty-day elimination period. The defendant improperly refused to provide those benefits.

### III. CONCLUSION

Upon *de novo* review [10] of the administrative record, the court finds that the

---

10. Even if the standard of review were arbitrary and capricious, this court's ruling would be the same. As another court in this district has stated,

> [a]n arbitrary and capricious standard is highly deferential and requires that the administrator's decision be upheld as long as it is rational in light of the plan's provisions, as well as reasonable with no abuse of discretion. Before concluding that a decision was arbitrary and capricious, a court must be confident that the decisionmaker overlooked something important or seriously erred in appreciating the significance of evidence.

*Marchetti v. Sun Life Assurance Co. of Canada,* 30 F.Supp.2d 1001, 1008 (M.D.Tenn.1998) (citations omitted); *see also Emerson Elec. Co.,* 202 F.3d at 846; *Yeager,* 88 F.3d at 381.

In this case, CNA disregarded the findings of the plaintiff's treating physician without any contradictory medical evidence. CNA failed to request the medical records relating to the period when the plaintiff's condition was diagnosed and then denied the plaintiff's claim on the grounds that it did not have such evidence. More importantly, CNA stated that it was denying the plaintiff's claim because it had no objective medical evidence of the plaintiff's physical limitations. In making this determination, CNA disregarded the x-ray provided by Dr. Levitt on the grounds that there were no comparative x-rays presented. However, this x-ray clearly showed that the plaintiff suffered from severe tricompartmental osteoarthritis. Dr. Stowers stated that this condition prevented the plaintiff from standing for more than thirty (30) minutes or walk-

plaintiff was entitled to receive short-term disability benefits under the terms of her ERISA plan. The court will, therefore, enter **JUDGMENT** in favor of the plaintiff and will **REVERSE** the determination of the plan administrator.

An appropriate Order shall enter.

### ORDER

Pending before the court is the plaintiff's appeal of a denial of benefits under a short-term disability plan governed by the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B) (2000). The defendant has submitted a brief in support of affirming the plan administrator's denial of benefits (Docket No. 12), and the plaintiff has submitted a brief in support of reversing the plan administrator's determination (Docket No. 22), to which the defendant has filed a reply. (Docket No. 23)

For the reasons discussed in the accompanying Memorandum, the decision of the plan administrator is **REVERSED,** and **JUDGMENT** is entered in favor of the plaintiff.

It is so Ordered.

ing more than thirty (30) minutes daily. The plaintiff's job required her to stand for one (1) hour and to walk for two (2) hours daily, carrying trays weighing at least five pounds for much of this time.

The court finds that CNA seriously erred in appreciating the significance of this evidence. CNA received sufficient, objective evidence that the plaintiff was incapable of performing the essential functions of her job. This is the very definition of disabled under the defendant's policy. Thus, the plan administrator's determination was not rational in light of the plan's provisions, and the administrator's denial of benefits would be reversed even if this court applied the highly deferential, arbitrary and capricious standard of review.